## THE M. J. RUDOLPH.

(Circuit Court of Appeals, Second Circuit.    June 12, 1923.)

No. 257.

1. **Collision ⬳94—Overtaking steam vessel held solely in fault for collision.**

    A steam lighter, overtaking a tug in East River in the daytime, *held* solely in fault for a collision between them, for violation of Inland Rules, art. 18, rule viii, and article 24 (Comp. St. §§ 7892, 7898), which imposed on her the duty to keep out of the way of the tug and to signal her desire to pass, whereas she proceeded without signal and at much greater speed until close to the tug, and when the latter was, perhaps, deflected from her course by the action of the tide, ran into and sunk her.

2. **Collision ⬳51—Overtaking vessel, approaching without signal, in fault for collision.**

    If an overtaking vessel, without signal, comes so close to the overtaken vessel that a sudden change of course by the latter may bring about a collision, the fault is that of the overtaking vessel.

3. **Collision ⬳52—Overtaken vessel not required to look behind her.**

    An overtaken vessel, receiving no signal from the overtaking vessel, is not required to look behind her before she changes her course, however abruptly.

4. **Collision ⬳125—Contributory fault must be clearly established.**

    Where the fault of one vessel is gross, and fully accounts for the collision, any doubts as to the contribution of the faults of the other, if any, should be resolved in her favor.

5. **Collision ⬳77—Absence of lookout not material, where it did not contribute to collision.**

    Absence of a lookout is not entitled to weight in cases where the proof is satisfactory that the vessel in fault saw the other in time to have taken every precaution it was its duty to take, and which, if taken, would have avoided the collision.

6. **Admiralty ⬳117—Appeal opens case to both parties for trial de novo.**

    An appeal by either party opens the case to both parties for trial de novo, and the decree may be modified in favor of appellee.

Appeal from the District Court of the United States for the Eastern District of New York.

Suit in admiralty by Thomas F. Timmins and others, doing business as the Croton Water Company as owners of the steam tug David F. Roche, against the steam lighter M. J. Rudolph; the M. J. Rudolph Company, Inc., claimant. From the decree, claimant appeals. Reversed, and decree directed for libelants for full damages.

For opinion below, see 262 Fed. 780.

Park, Mattison & Lynch, of New York City (Samuel Park and Anthony Lynch, Jr., both of New York City, of counsel), for appellant.

Foley & Martin, of New York City (W. J. Martin and George V. A. McCloskey, both of New York City, of counsel), for appellees.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

ROGERS, Circuit Judge.    The libelants brought this suit in admiralty as owners of the steam tug David F. Roche, on their behalf

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

and on behalf of the crew of the tug, against the steam lighter and against any and all persons having or claiming to have any interest therein, in a cause of collision, civil and maritime.

It is alleged that in the afternoon of July 29, 1918, the steam tug, bound for Fulton street, Brooklyn, was proceeding up the East River on the Brooklyn side, about off Pier 7, the tide being ebb and the weather clear, when the steam lighter, bound up the river astern of the tug, and apparently proceeding under full speed, and without giving any signals or warning of its approach, overtook the tug, striking the tug on the latter's starboard side aft with such force as to cut into the tug, pushing her up to Pier 5, turning her over, and causing her to sink; that the crew of the tug were cast overboard; that although libelants procured the services of wreckers in endeavoring to locate the sunken vessel, and had the waters at and in the vicinity of the place where she sank searched, they have been unable to locate the sunken vessel; and that she is now a total loss.

The libel contains the usual allegations that the collision occurred without any fault on the part of the tug or those in charge of her, but was solely due to the fault of the steam lighter and those in charge of her, and it is alleged that until the happening of the collision the tug was tight, staunch, strong, and seaworthy, and properly equipped and manned. Damages in the amount of about $9,000 were demanded.

The owner and claimant of the lighter in its answer alleges that the lighter was proceeding up the East River for Pier 46, New York, and that when she was abreast of Pier 4, Brooklyn, and about 150 feet off the end of the pier, the tug, without giving any signals, attempted to cross the bow of the steam lighter from port to starboard; that the lighter immediately stopped and reversed, but it was impossible to prevent collision, and the starboard side of the tug amidships struck the bow of the lighter, causing the tug to capsize and sink about 75 feet off Pier 5, Brooklyn.

The District Judge found that the collision was one which could have been easily avoided by careful observation and lookout on the part of either vessel. Both vessels were found to have been actually at fault, and the libelants had a decree for $4,449.72; that sum being one-half of the damages and costs.

[1] This collision occurred about 5:15 p. m. on July 29, 1918, and was wholly inexcusable. It was broad daylight, and it does not appear that there was the slightest fog. The tide was running ebb. Both vessels were headed up the river. The captain of the Rudolph testified that, when he first saw the tug, she was 200 feet off his port bow, and that her starboard quarter was just abreast the bow of his boat. Both boats, he said, were heading "just about the same." His story is that, when the Rudolph was "just about the south side of Pier 4," the Roche, without there having been any exchange of whistles, suddenly changed her course and headed right across the bow of the Rudolph, heading in for the open dock on the upper side of Pier 4; that when he noticed that the lighter was crossing his bow he gave one bell to slow down, and another one to stop; then he gave two bells to back, and his boat answered, going back; that the two boats came together,

the Rudolph striking the Roche on the starboard side, just about the engine room, which caused the latter to turn over, and which resulted in her sinking—the crew jumping into the water for safety.

It is beyond question that the Rudolph was the overtaking vessel. The testimony of the captains of both boats proves the fact. The captain of the Rudolph admits that he overtook the Roche. Article 24 of the Inland Rules, Act June 7, 1897, c. 4, 30 Stat. 101 (Comp. St. § 7898), provides that, notwithstanding anything contained in these rules, every vessel, overtaking any other, shall keep out of the way of the overtaken vessel. And the article also provides that:

"Every vessel coming up with another vessel from any direction more than two points abaft her beam * * * shall be deemed to be an overtaking vessel; and no subsequent alteration of the bearing between the two vessels shall make the overtaking vessel a crossing vessel within the meaning of these rules, or relieve her of the duty of keeping clear of the overtaken vessel until she is finally past and clear."

As the Rudolph was the overtaking vessel by the admission of her own captain, and at no time prior to collision was ever "finally past and clear" of the Roche, it was the duty of the Rudolph to keep out of the way of the Roche, and this she most clearly did not do. That she was in most serious fault is perfectly plain. The Rudolph, if she contemplated passing the Roche, as she evidently did, for her speed at the time was about 6 miles an hour, while the Roche was only making about 1½ miles an hour, was ignoring also rule 8 of article 18 of the Inland Regulations of 1897 (Comp. St. § 7892), which provides as follows:

"When steam vessels are running in the same direction, and the vessel which is astern shall desire to pass on the right or starboard hand of the vessel ahead, she shall give one short blast of the steam whistle, as a signal of such desire, and if the vessel ahead answers with one blast she shall put her helm to port; or if she shall desire to pass on the left or port side of the vessel ahead, she shall give two short blasts of the steam whistle as the signal of such desire, and if the vessel ahead answers with two blasts, she shall put her helm to starboard. * * *"

See The James L. Morgan, 225 Fed. 34, 36, 140 C. C. A. 360.

[2, 3] If the overtaking vessel comes so close to an overtaken vessel that a sudden change of course by the latter may bring about a collision the fault is that of the overtaking vessel. She should not come so close without a signal. As this court held in The Merrill C. Hart, 188 Fed. 49, 51, 110 C. C. A. 187, 189:

"The overtaken vessel is not required to look behind before she changes her course, however abruptly."

And the rule which requires a signal from the overtaking vessel and assent from the other is intended, as we said in that case, to avoid just what, on the Rudolph's theory, happened on this occasion. Counsel upon the argument in this court stated the The Merrill C. Hart was overruled—"contradicted" was the term used—by our subsequent decision in The Minnie, 225 Fed. 36, 140 C. C. A. 362. But the statement is not in accordance with the facts. The Merrill C. Hart was not overruled, either expressly or by implication, either in The Minnie or in any other case decided by this court. In The Minnie she blew

a signal of two whistles to the Watuppa, indicating that she would pass up starboard to starboard, which the Watuppa answered with two, indicating her acquiescence. If in the instant case the Rudolph had blown two whistles to the Roche, and the latter had answered with two, the question presented would be a totally different one from that which is here involved.

[4] The fault of the Rudolph is so grave and so fully accounts for the collision that the court should not be astute to find fault with the navigation of the Roche; and we think the case is one in which we should unhesitatingly apply the rule laid down in The City of New York, 147 U. S. 72, 85, 13 Sup. Ct. 211, 37 L. Ed. 84, in The Ludwig Holberg, 157 U. S. 60, 71, 15 Sup. Ct. 477, 39 L. Ed. 620, and in The Umbria, 166 U. S. 404, 409, 17 Sup. Ct. 610, 41 L. Ed. 1053, that where the fault of one vessel is gross, any doubts regarding the management of the other vessel, or the contribution of her faults, if any, to the collision, should be resolved in her favor. In The Great Republic, 23 Wall. 20, 35, 23 L. Ed. 55, which was a collision case, the court found nothing in the record to excuse the Republic. The court also found that the Cleona was not free from fault, but nevertheless said:

"This fault bears so little proportion to the many faults of the Republic that we do not think, under the circumstances, the Cleona should share the consequences of this collision with the Republic."

The fault which the District Judge found with the Roche was that she "was running without a lookout in the absence of a deck hand. He (the captain of the Roche) kept no lookout himself, except to observe the boats apparently that were coming down through the Brooklyn Bridge." But as he was going up the river, and observed the boats that were coming down the river, he was not under obligations to observe what boats were approaching him from the rear. It was the duty of all such boats to keep away from him. Again he says:

"He [the captain of the Roche] allowed the Rudolph to get so close that the strong ebb tide, as it came through the Brooklyn Bridge, swept him in and directly across the bow of the Rudolph, without giving warning to that vessel of any need of space in which to execute the maneuver."

But he was under no obligations to warn a vessel coming up behind him, and which had not given him notice of her presence, that he was going to make the maneuver; and from what has already been said in this opinion it appears that it is not the duty of an overtaken vessel to look behind, or to give warning to a vessel behind her, and which has not herself given warning of her presence, before she changes her course, however abruptly.

Moreover, it is not clear that the Roche changed her course abruptly, or at all, just prior to collision. The captain of the Roche testified as follows:

"Q. Now, it has been testified here that you, before the collision, had made a turn to starboard to enter the slip. Had you made any turn of your boat at all before the collision? A. No, sir.

"Q. Were you on the same course you followed from Pier 10? A. Yes, sir."

He also testified as follows:

"Q. Up to the time of the striking, how was your boat headed? A. Up the river."

The collision took place near Pier 4, and a watchman standing at the end of that pier was observing the two boats from the time they passed Pier 5 up to the time of collision, and he testified that the Roche was going in a straight line up the river—was going along straight up the river—all the time he saw her. He also testified that, after the Rudolph struck the Roche, the Rudolph continued on her way two or three boat lengths up the river, and that at the time of actual collision the captain had his head out (of the pilot house) "talking to some men in the back of the boat." He appears to have been a truthful and disinterested witness, notwithstanding the following excerpt from his testimony:

"Q. Did you see the captain of the Rudolph afterwards? A. Yes; I seen him at the dock.

"Q. Were you talking with him? A. I spoke to him; yes. I didn't speak to him at all. I didn't want to speak to him. I told him he ought to be lynched, the way the thing occurred.

"Q. Did he say anything? A. No, sir; walked away."

[5] The captain of the Rudolph testified that he was in the pilot house and in charge of her navigation at the time of this collision. He stated that there was a two-foot mast in the middle of the space in front of the pilot house, and that it was between him and the Roche, and that he never saw the Roche until she was between Piers 4 and 5. When he saw her, according to his story, she was 200 feet off the port side of his boat, with her starboard quarter straight abreast of the bow of his boat. With the view from the pilot house obstructed as this one was, the presence of a lookout was more important to the safe navigation of the vessel than is ordinarily the case. But the absence of a lookout is not entitled to weight in cases where the proof is satisfactory that the vessel in fault saw the other in season to have taken every precaution it was its duty to take, and which, if taken, would have avoided the collision. The Maria Martin, 12 Wall. 31, 44, 20 L. Ed. 251. The evidence shows that, when the Rudolph discovered the Roche, she did nothing to avoid a collision, because he expected the two vessels to pass without any trouble. That being the captain's opinion, the absence of a lookout, under the circumstances, had little to do with the collision, but was nevertheless a serious and additional fault.

[6] The claimant, M. J. Rudolph Company, Inc., alone appealed; but it is well settled, at least in this circuit, that an appeal opens up the whole case for reconsideration in this court. It was not necessary, therefore, that the libelants also should appeal, as an appeal by either party opens the case to both parties for a trial de novo. T. M. Duche & Sons v. The John Twohy, 255 U. S. 77, 41 Sup. Ct. 251, 65 L. Ed. 511. Hence this court may award full damages to the libelants, although they failed to appeal.

The decree is reversed, and the court below directed to enter a decree for the full amount of the damages in favor of the libelants against the steam lighter M. J. Rudolph.