## LONG ISLAND R. CO. et al. v. KILLIEN.

(Circuit Court of Appeals, Second Circuit. April 16, 1895.)

1. COLLISION IN EAST RIVER — TUG AND FERRYBOAT — OVERTAKING VESSEL— SUDDEN SHEER—INCOMPETENT WHEELSMAN.

Where a tug coming down the East river, upon emerging from the eddy into the flood tide at Corlear's Hook, was swept by the current against an overtaking ferryboat, *held*, that the tug was in fault, being in charge of an incompetent wheelsman, either because he neglected to port his wheel in due season, or to do so sufficiently to neutralize the effect of the cross current. 63 Fed. 172, affirmed.

**2. SAME—OVERTAKING VESSEL—DUTY TO KEEP AWAY.**

The law does not impose upon an overtaking vessel the obligation of anticipating improper navigation on the part of the other vessel. *Held*, therefore, that a ferryboat, coming down the East river, which attempted to pass a tug on the port side, just as the latter was emerging from the eddy into the cross current created by the flood tide at Corlear's Hook, was not in fault in not allowing more than 100 feet between them. 63 Fed. 172, reversed.

**3. SAME—NAVIGATION OF EAST RIVER—VIOLATION OF STATUTORY RULES.**

A vessel which violates the state statute requiring vessels to keep as near as possible in the center of the East river is not, on that account, to be condemned for a collision which would not have occurred if the other vessel had exercised ordinary care. 63 Fed. 172, reversed.

Appeal from the District Court of the United States for the Southern District of New York.

This was a libel in personam by Mary Killien, as administratrix of Martin Killien, her husband, to recover damages under the New York statute for the death of the deceased, who was a fireman on the tugboat William H. Walker, on the afternoon of June 13, 1893, through an alleged negligent collision between the Walker, owned by the respondent Hyde, and the ferryboat Garden City, owned by the respondent the Long Island Railroad Company. The district court found that both vessels were in fault for the collision, and entered a decree against both for $5,000, being the full amount allowed by the statute. 63 Fed. 172. The collision occurred on the East river, from 200 to 300 feet off the New York docks, about opposite the marble yard, just below the turn of Corlear's Hook. The weather was clear and pleasant; the tide, strong flood. Both boats were going down river,— the Garden City, on one of her regular trips from Hunter's Point to James' slip; the Walker, going down under one bell, near the docks, looking for a job. About 200 feet in front of them was the transfer tug No. 5, also going down. All three boats had come to a stop, just above the Grand Street ferry, for two ferryboats of that line on the New York side, one coming out of that ferry, and another going in. At that time the Garden City was a little outside of the Walker, and about 200 feet astern of her. As soon as the inward-bound ferryboat at the Grand Street ferry would permit them to pass, the three boats started ahead, the Garden City sheering at first somewhat outwards into the river, but soon putting her wheel to port, and turning her head down the river. When the tug reached Corlear's Hook, and emerged from the eddy into the flood tide, she lost control of her movements, and took a sheer of about 100 feet to port, striking the Garden City, and causing the death of libelant's husband.

William J. Kelly, for appellants.

E. H. Taft and T. M. Taft, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

WALLACE, Circuit Judge.   We agree substantially with the opinion of the district judge in regard to the facts of the collision out of which this suit arises.   The appellant's ferryboat, the Garden City, had nearly overtaken the tug Walker, and was about to pass her on her port side, upon a course not more than one hundred feet away from her, when the tug, as she emerged from the eddy into the flood tide at Corlear's Hook, lost control of her movements, and was swept by the strong current against the starboard side of the Garden City.   That the tug was improperly navigated is clear.   In rounding the Hook on such a course as the tug took, when there is a flood tide, a strong cross current is encountered as soon as a vessel passes out of the eddy into the true tide, which

will sheer the vessel to port. The tendency to such a sheer is to be anticipated, and is usually neutralized by keeping the vessel sufficiently under a port wheel. The tug on the occasion in question was temporarily in charge of an incompetent wheelsman; and either because he neglected to port his wheel in due season, or to do so sufficiently, she took a rank sheer, and he lost command of her movements. We fully agree with the district judge that the tug was in fault for the collision. We are unable, however, to agree with his conclusion that the ferryboat was also in fault. The master of the Garden City was at the wheel of his vessel, as was also a wheelsman. They were watching the movements of the tug. There was ample room to enable the Garden City to pass the tug safely on her port side, no vessels were approaching to embarrass her in the effort to do so, and there was no conceivable reason why her master should attempt to direct the course of his vessel dangerously near to that of the tug. The sheer of the tug was observed, and, as soon as the master and wheelsman of the Garden City saw that there was danger of collision, they reversed her engines and starboarded her wheel. Doubtless the Garden City was not being navigated as near as possible in the center of the river, as the terms of the state statute, applicable to the East river, required; but this, as we have frequently had occasion to decide, should not condemn her for the consequences of a collision, which, notwithstanding her presence there, would not have occurred if the other vessel had exercised ordinary care to avoid it. Only such vessels can invoke the violation of the statute as an actionable fault as have been prejudiced by it, either because their own movements have been embarrassed by the presence of the offending vessel, or because they have omitted to take some precaution in ignorance of her presence, which they might otherwise have avoided danger by adopting. As an overtaking vessel, it was the duty of the Garden City to keep out of the way of the tug; and in this behalf it was incumbent upon her, when shaping her course to pass the tug, to allow a sufficient margin for safety, taking into consideration all the incidents of the situation; among them, the tendency of the cross current to deflect the course of the tug. The master of the Garden City was an experienced navigator. His vessel was on one of her regular trips, over a route which he had pursued for 27 years. He was perfectly familiar with the tides and currents around the Hook. Intrusted with the responsible command of a ferryboat, he had every incentive to be prudent. His vessel could gain no advantage by hugging the shore or crowding upon the course of the tug. He undoubtedly knew what reasonable allowance ought to be made for the influence of the cross current upon the course of the tug, and the dictates of ordinary prudence enjoined upon him the necessity of making such allowance. He deliberately chose a course which in his judgment at the time was sufficiently outside the tug's course to be a safe and prudent one. We think his judgment, formed under such circumstances, was not a rash one, or one which should be pronounced erroneous merely because subsequent events have shown

that there would not have been a collision if he had pursued a course further to port. The witnesses do not attribute the collision to an ordinary contingency of navigation. The master of the tug testifies that, just as the Garden City began to come abreast of the tug, her bow lapping the stern of the tug, she took a sheer of 100 feet to starboard. The wheelsman of the tug testifies that the Garden City took a rank sheer, and came right for the tug. The testimony of these witnesses, although generally discredited, is of some value, as showing the best theory they can invent in exculpation of their own vessel. The evidence amply supports the opinion of the district judge that the tug swung to port because of the faulty navigation of her wheelsman. In view of all the testimony in the record, we are satisfied that the course of the Garden City was shaped sufficiently far on the port hand of the tug to have enabled her to pass the tug safely, allowance being made for all the ordinary exigencies of navigation, if the tug had not been guilty of an unnecessary and culpable sheer to port, and that the collision would not have taken place if the tug had been handled with reasonable care and skill. The law does not impose upon an overtaking vessel the obligation of anticipating improper navigation on the part of the other vessel. By this we do not mean that the overtaking vessel may not be guilty of contributory fault, when the circumstances indicate that the other vessel is under incapable management, or is about to neglect in any respect the duty of reasonable care and prudence. There are circumstances under which one person ought to foresee and provide against the negligence of another; but ordinarily an act, though negligent, is not the proximate cause of an injury, when but for the intervening negligence of another the injury would not have been inflicted. Lane v. Atlantic Works, 111 Mass. 136; Cuff v. Railroad Co., 35 N. J. Law, 32; Vicars v. Wilcocks, 8 East, 1; Daniel v. Railway Co., L. R. 5 H. L. 45. "A finding that negligence, or an act not amounting to wanton wrong, is the proximate cause of an injury, is not warranted unless it appear that the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances. Where there is no intermediate efficient cause, the original wrong must be considered as reaching to the effect, and proximate to it." Railway Co. v. Kellogg, 94 U. S. 469. In the present case there were no circumstances to indicate to the master of the Garden City that those in charge of the tug were not competent to navigate her properly, or that there was any reasonable likelihood that they would lose control of her movements. We conclude, therefore, that the owner of the Garden City was erroneously adjudged liable for the consequences of the collision. The decree of the district court is reversed, and the cause remitted to the district court, with instructions to dismiss the libel as to the Long Island Railroad Company, the appellant.