## WILHELMSEN v. LUDLOW.

(District Court, D. Washington, N. D. March 13, 1897.)

1 COLLISION—VESSEL AT ANCHOR—UNMANAGEABLE STEAMER.
  A steamer which steers badly is in fault for approaching so near to an anchored vessel that a collision occurs through her failure to answer her helm.

2. SAME—IMPROPER ANCHORAGE—HARBOR REGULATIONS.
  The fact that a vessel has come to anchor without obtaining the permit from the harbor master required by the port regulations does not place her in fault where another vessel runs into her in clear daylight.

Gorham & Gorham, for libelant.
F. C. Robertson, Asst. U. S. Atty., for respondent.

HANFORD, District Judge. The Monterey, a public war vessel of the United States, while lying at anchor in the harbor of Seattle, distant about 500 feet from the outward end of Arlington dock, on the afternoon of a clear day, was run into by the steamer Transit, a Norwegian vessel owned by the libelant. The Transit was entering the harbor, and intending to make a starboard landing on the north side of Arlington dock, and, to reach her berth at the dock, it was necessary for her to pass the Monterey to the northward. There was nothing to prevent her officers from seeing the Monterey, and making out her position accurately, and in fact they did see the Monterey in ample time to have avoided coming in collision with her. If the Transit had steered a proper course towards her landing, she would have passed the Monterey on her starboard side; and the force of the wind and tide had a tendency to carry her northward, and from the Monterey, rather than to exert any influence in bringing the vessels together. The libel alleges that, as the Transit entered the harbor with the object of making a landing as aforesaid, she "was headed for the stern of the Monterey; and, when within five or six cables' length of the cruiser (being as soon as it was considered safe by those in command of the Transit), the engines of the Transit were brought to a dead stop, and helm ordered to starboard, for the purpose of passing the stern, and to the northward of said cruiser about a ship's length, which order was promptly obeyed. After a reasonable time had elapsed, the said ship not answering her helm, a sudden and heavy squall then blowing and striking her on the starboard quarter, the order was given 'Hard a-starboard!' which order was promptly obeyed, and directly after, seeing that said vessel did not respond, the engines were ordered full speed astern, which order was promptly obeyed, and the anchor let go." The Transit, however, did not respond to her helm, nor stop her headway until she had struck the Monterey with great force, doing considerable damage. The amended libel shows affirmatively that the Transit was in fault, for she failed to obey her helm, which fact proves that she was an unmanageable vessel, and her officers should have kept at a safe distance from other vessels, or else they should have proceeded so cautiously that by use of her machinery the

Transit could have stopped and reversed in time to have avoided the collision. This fault on the part of the Transit, as shown by the amended libel, is sufficient in itself to account for the collision. It is not pretended that the Monterey did anything whatever to cause the collision, except to remain stationary in the way of the Transit. The libel, however, seeks to throw the blame upon her commander, by alleging that she was anchored at an improper place, and that a city ordinance of the city of Seattle was violated by anchoring the vessel in the harbor without a permit from the harbor master, and without being assigned to a place for anchoring. The authorities cited by the libelant's proctor do not sustain the position he has taken. I will refer to them briefly: The Clara, 102 U. S. 200–203: In this case, a small schooner, having no watch on deck, was lying at anchor inside the Delaware breakwater, on a very dark night, when vessels were constantly arriving, for shelter from an approaching storm, one of which, in proceeding to a proper anchorage, without any fault on her part, collided with and sunk the schooner. If a sufficient watch had been kept on deck of the latter, the collision might have been avoided. It was held that the vessel at anchor was wholly in fault. It appears by the opinion of the court that there was an entire failure to show that the other vessel was guilty of any fault of omission or commission, and, so far from deciding that being anchored at an improper place was the controlling fact in fixing the liability, it is given as the conclusion of the court that "the failure to keep a proper watch on deck of the Julia Newell was the cause of the collision." The North Star, 106 U. S. 17–29, 1 Sup. Ct. 41, was a case of collision between two vessels under way at sea, off the Jersey shore, south of Sandy Hook. There is nothing in the facts of the case calling for a decision which in the remotest degree bears upon the question of fault on the part of a vessel lying at anchor. The case appears to have been cited by counsel for the sake of a reference therein to the rules of Oleron and the laws of Wisbuy, giving the rule for division of damages in the supposed case of a ship coming into port negligently, and striking a vessel at anchor in an improper position, so that both are in fault, and both damaged. There is nothing in this to establish liability upon a vessel at anchor, if struck by another vessel, if her position was known to those in charge of the incoming vessel in time for them to have avoided the collision. The Manitoba, 122 U. S. 97–111, 7 Sup. Ct. 1158, was a case of a collision between two vessels under way on Lake Superior. There is nothing in the facts of the case, nor in the rules of law discussed in the opinion of the court, having any bearing on the question at issue here. The case appears to have been cited as an authority to sustain the proposition that in cases of mutual fault the damages shall be divided. The Armonia, 67 Fed. 362–365: This was a case of a collision between two vessels, one of which was at anchor in Delaware Bay. The collision occurred in the nighttime, and the pleadings raised an issue as to whether the vessel at anchor was in a proper place, exhibited a proper light, and maintained a watch.

Judge Butler held that the burden of proof was cast upon the vessel at anchor to establish all of these facts. But the rule is different in a case of collision on a clear afternoon, the vessel at anchor being plainly visible, and her position known to those in charge of navigating the incoming vessels in time for them to have avoided the collision. In this case there is no issue raised as to fault on the part of the Monterey, by failure to maintain a watch or give timely notice of her position.

The position of the Monterey, and failure on the part of her commander to comply with the city ordinance with reference to obtaining a permit from the harbor master, are matters of no importance. A mere failure to comply with prescribed rules of navigation or harbor regulations does not render a vessel liable for damage caused by a collision, unless the neglect or wrongful act is shown to be the proximate cause of the collision. Railroad Co. v. Killien, 14 C. C. A. 418, 67 Fed. 365-368.

A visible stationary object in any position cannot be regarded as the cause of an injury to a person who, with full knowledge of its existence, unnecessarily comes in collision with it. The law does not authorize the application of destructive force against a wrongdoer when the wrong consists of a mere intrusion, without license, or a trespass upon uninclosed grounds or highways, whether public or private. I cannot regard the possession by Capt. Ludlow of a permit from the harbor master, or the want of it, as a circumstance having any influence whatever to cause or prevent the collision. I should be reluctant to hold the commander of a national ship to be an intruder in any port of the United States in which he should choose to cast anchor without permission previously obtained from the harbor master. But it is unnecessary for me to pass upon the validity of the city ordinance pleaded as a restriction upon the freedom of a commanding officer to choose for himself a place to anchor a public vessel of the United States. The most that could be claimed under the ordinance would be the right to have an intruding vessel removed to a place assigned to her by the harbor master, or to collect from the offending captain the penalty for violation prescribed by the ordinance. The principle involved is the same as in the case of The Blue Jacket, 144 U. S. 371-394, 12 Sup. Ct. 711, in which the supreme court of the United States decided that failure on the part of a steam tug to have on board a licensed mate, and to maintain a proper lookout while under way with a vessel in tow, in the nighttime, in the Straits of Juan de Fuca, did not render the steam tug liable for damages caused by a collision, although the failure in the particulars mentioned was a flagrant violation of the positive requirements of United States statutes, the reason for the decision being that the violation of law was not the cause of the collision.

In view of all the facts alleged, it is my conclusion that no actionable wrong on the part of the defendant is shown. Therefore the libel will be dismissed, with costs.